[Civ. No. 16380. Second Dist., Div. Three. Feb. 28, 1949.]

GERTRUDE E. HAPPOLDT, Respondent, v. THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA (a Corporation), Appellant.

Adams, Duque & Hazeltine and A. Andrew Hauk for Appellant.

Henry C. Rohr, Ben C. Cohen and Henry A. Plattner for Respondent.

WOOD, J.—On October 31, 1925, the defendant issued its policy of life insurance in the sum of $50,000 on the life of John H. Happoldt. On January 20, 1926, the defendant issued its additional agreement for indemnity benefit of $25,000 for death from accident, which agreement was attached, as a rider, to said policy of life insurance. The plaintiff, who is the widow of the insured, is the beneficiary named in the policy and in the additional agreement. The insured died on December 12, 1945. All premiums had been paid. The defendant paid the $50,000. The agreement, or rider, for additional indemnity benefit for death from accident provided in part that if "death resulted directly, independently and exclusively of all other causes from bodily injuries effected solely through external, violent and accidental means, of which . . . there is as evidence a visible contusion or wound on the exterior of the body, and that such death occurred within 90 days from the date of such bodily injuries, then the sum of Twenty-five Thousand Dollars will become payable under this agreement in addition to and together with the face amount of said policy. . . ." It was also provided therein that said additional indemnity should not be payable if the insured's death resulted "directly or indirectly from bodily or mental infirmity . . . or illness or disease of any kind."

This is an action to recover the additional $25,000. In a jury trial, a verdict for $25,000 was returned on June 30, 1947, and a judgment for that amount was entered on July 1, 1947. On July 31, 1947, plaintiff filed a notice of motion to amend said judgment to include interest on the $25,000 at the rate of 7 per cent per annum from February 8, 1946. The motion was granted on August 13, 1947, and the judgment which had been entered was then amended accordingly. Defendant appeals from the judgment entered on July 1st, from the judgment as amended on August 13th, and from the order granting plaintiff's motion to so amend the judgment.

Appellant contends that the evidence was insufficient to support the judgment. Its argument is that the insured's death did not "result directly, independently and exclusively of all other causes from bodily injuries effected solely through external, violent and accidental means"; and that his death resulted from bodily infirmity, illness and disease.

At the time of the issuance of the policy and rider, and thereafter until July, 1928, the insured was employed by a clothing company in New York. At said last mentioned time the insured, having developed asthma, discontinued his work and thereafter did not engage in any occupation. The insured and plaintiff became residents of Los Angeles in 1930. Soon thereafter, in 1930, the insured's claim for total and permanent disability benefits under the insurance policy was approved, and from that date until the death of the insured the defendant paid him disability benefits in the sum of approximately $65,000. He continued to be afflicted with asthma from 1930 until his death. Every morning it was necessary for him to cough until he dislodged "an oyster of tough phlegm." He went alone to various places in the city, and he often went, over a period of 16 years, on a bus to Gardena where he played poker, and he often attended motion picture shows. From 1937 until about three weeks before his death he was under the medical care of Dr. Ruth, who saw him at irregular intervals—at times there were intervals of six months when he did not see him. On October 26, 1945, the plaintiff sent the insured to a sanitarium for rest because he was exhausted nervously. She visited him at the sanitarium every other day, and at all such visits, until November 15th, he was fully clothed and he walked without assistance. On November 15th, when she visited him, she found him sitting on the edge of his bed, and she noticed that he could not stand up. The next morning she had him

removed from the sanitarium to their home. Dr. Ruth then examined him and found that he had a fractured right femur, with swelling and discoloration over his right hip. Then the insured was taken to the general hospital, and Dr. Ruth did not see him again. On November 19th an operation was performed upon insured's right hip, and the fracture was reduced by inserting a ''Z nail'' across the fracture. He died 23 days later, on December 12, 1945, at the age of 67 years.

The general hospital records relative to the insured, which were received in evidence, show as follows: that he was admitted to the hospital on November 16, 1945; five days prior thereto he had fallen and injured his right hip; he had had asthma for 16 years; at the time of entering the hospital his blood pressure was 170 over 100, his heart was moderately enlarged, his liver was ''palpable two fingers down to the right''; on November 19th an open reduction of the fracture of the right hip was performed, and the ''patient left the table in fair condition''; on December 3, 1945, he became comatose; on December 7th, ''Cond is same. prognosis poor.''; on December 10th, ''prognosis poor 2 days ago, Seen by two medics resident who said patient was terminal as far as two days go,'' and ''patient appears to be terminal Dr. Tompkins called relative to transfer to medical ward; This case is no longer an ortho. problem. Advise: (1) transfer to a medical ward.''; a report of December 10th stated ''T 103.4 . . . improvement of lung path. Widespread bronchopneumonia on left. No evidence of pulmonary edema. Liver percusses down 3 F. but is a chronic alcoholic. No venous distension of peripheral edema. Hip is now healed. Problem is no longer ortho.''; and a report of December 12, 1945, at 11 (a.m.) states ''end near,'' and at 4:45 (p.m.) states, ''patient died.'' Those hospital records also show that following the operation the insured was given three grains of digitalis three times daily; that, four days after the operation, insured's blood pressure was 200 over 120, and that the giving of digitalis was then discontinued. Those records also show that the medical summary, made after death, was as follows: heart failure due to broncho-pneumonia and congestive failure due to arteriosclerotic heart disease; coronary sclerosis; cronic myocardial degeneration; and the complications were: fracture of the right hip; emphysema.

An autopsy was performed on December 13, 1945, by Dr. Myers, an autopsy surgeon in the office of the coroner of Los Angeles County. His autopsy report states that the

immediate cause of death was broncho-pneumonia and emphysema; and that other conditions were coronary sclerosis, chronic myocardial degeneration and recent fracture of the right hip. His report also states that the heart was slightly enlarged, and the liver was enlarged "about 3 fingerbreadths below the costal margin and contains much fat." The death certificate signed by the coroner stated that the immediate cause of death was broncho-pneumonia and emphysema.

An autopsy was performed on December 15, 1945, by Dr. Butt, who is the chief pathologist of the general hospital, but the autopsy was not made in his official capacity—it was made under private employment by the defendant. That report states that his anatomical diagnosis, based on the autopsy performed by him, was as follows: "1. Emphysema with moderate right cardiac hypertrophy and decompensation. 2. Bronchitis, chronic. 3. Bronchitis, acute. 4. Arteriosclerosis, local, coronary arteries with scars in the heart muscle. 5. Arteriosclerosis, local, aorta. 6. Pleurisy, chronic, adhesive. 7. Operation, open reduction of fracture of the right hip, healed. 8. Lipoma, subcutaneous tissue, neck." Dr. Butt testified that the cause of death was heart failure; that he doubted that there was any connection between the insured's death and the fracture of his leg; and that, basing his opinion upon the evidences of cardiac failure, he was of the opinion in this particular case that cardiac failure "would have produced death regardless of . . . what happened to the man in the interim." He also testified that the insured had a nutmeg liver, and that he did not think the condition of the liver could cause death but the condition was an indication of failing heart; and the heart, liver, and spleen were about normal size.

Plaintiff contended at the trial that the accidental fall, and the resulting broken hip suffered by the insured, set in motion a chain of events, namely, the surgery, the pneumonia, and the cardiac failure, which eventually caused death. Appellant contended at the trial that death was not the result of the injury, but was the result of diseases known as bronchial asthma and heart disease.

Four doctors of medicine, called as witnesses by plaintiff, gave testimony in support of plaintiff's contentions, and four doctors of medicine, called as witnesses by defendant, testified in support of defendant's contentions.

■ Dr. Ruth, above referred to as the personal physician of the insured from 1937 until the insured entered the general hospital, was called as a witness by plaintiff. He testified that

in 1937 the insured was suffering from a moderately enlarged heart, rapid and irregular heart beat, and bronchial asthma of cardiac origin. In answer to a hypothetical question, based upon the autopsy report of the coroner, the hospital records, and upon assumed facts within the evidence above mentioned, regarding the insured's activities and general health prior to his fall, Dr. Ruth testified that he would say definitely there was a connection between the insured's hip injury and his death. He also testified that he had observed the insured for a period of seven years, and he had always recovered from the asthmatic attacks; the insured had had a fractured pelvis about two years previously and he recovered from that without difficulty; and in his opinion the insured might have continued to live if the hip injury here involved had not occurred.

Dr. LaJoie, called as a witness by plaintiff, testified that in September, 1945, when Dr. Ruth was not available, he was called to the insured's home where he found the insured in a semicomatose condition which apparently resulted from an overdose of sleeping tablets. In answer to a hypothetical question, based upon the autopsy report of the coroner, the hospital records, and assumed facts within the evidence above mentioned, Dr. LaJoie testified that in his opinion "the precipitating cause of death was the fracture of the hip, which in itself started events . . . like the fracture of the hip, the surgery, and the pneumonia which set in after the surgery and then the cardiac failure which ensued." He testified, on cross-examination, that the fracture alone did not cause the death, but it was the complications that arose after the fracture that caused the death—a combination of the events of pneumonia, putting him to bed, lowering and enfeebling his circulation, and finally cardiac failure; that in his opinion the preexisting cardiac condition could contribute to the death.

Dr. Brem, called as a witness by plaintiff, testified, in answer to a hypothetical question, based upon the autopsy report of the coroner, the hospital records, and assumed facts within the evidence above mentioned, as follows: "Well, I would say that—I have no doubt that the primary cause of death was certainly the injury [the fractured hip] sustained by this man. The immediate cause of death was complications arising from this, to be sure; surgery, bronchial pneumonia, and eventually death. None of these influencing things would have happened had it not—had not this person been injured in the first place, and it is my conviction; I feel sure that there was nothing in this man's body, according to

the autopsy description, given by the coroner surgeon, to indicate that he had anything at all that predisposed him toward—to a sudden and unexpected death.'' On cross-examination he testified that the condition of chronic asthma would contribute to the death; that the coroner's autopsy report was not a very exhaustive report but was sketchy, and he had to assume that everything which was not mentioned in it was normal; and if an exhaustive autopsy found to the contrary he very likely would be guided by it. On redirect examination, after having studied the autopsy report made by Dr. Butt, he testified that it was a complete report but it did not alter his conclusions as to the cause of the insured's death; that after reading Dr. Butt's report he was still of the opinion the fracture of the hip had a direct connection with the death of the insured; and ''I still believe, even more firmly than ever, if possible, that the fracture was the incident that started all of these things that eventually terminated in this man's death.''

Dr. Lasky, called as a witness by plaintiff, testified, in answer to a hypothetical question, based upon the coroner's autopsy report, the hospital records, and assumed facts within the evidence above mentioned, that the insured died as a result of the fracture of his hip; that ''There is no doubt in my mind but what this man suffered an injury which introduced a series of events . . . which ended in death.'' On cross-examination he testified that the cause of death was bronchiolitis and bronchial pneumonia, which were secondary to the trauma, the accident.

Dr. Butt, called as a witness on behalf of defendant, testified that the ''main operating cause of death in this case was heart failure''; that in his opinion, right side hypertrophy of his heart and chronic bronchitis were the main operating causes of the death of the insured; that (contrary to the finding of the coroner's autopsy surgeon) he found no evidence of bronchial pneumonia; and that the insured's major condition was coronary disease.

Dr. Ruddock, called as a witness by defendant, testified, in answer to a hypothetical question, that the proximate cause of death was ''chronic arteriosclerotic heart disease with failure.''

Dr. Newbarr, called as a witness by defendant, testified, in answer to a hypothetical question, that the proximate cause of death was arteriosclerotic heart disease; there is nothing in the coroner's autopsy report which would substantiate a

conclusion that bronchial pneumonia was the cause of death; and the accident could not have been a primary cause of the death but it could have contributed to it.

Dr. Cefalu, called as a witness by defendant, testified, in answer to a hypothetical question, that the insured's death was caused by a myocardial degeneration due to arteriosclerotic changes; and that in his opinion bronchial pneumonia did not cause the death. The testimony of the four doctors called as witnesses by the plaintiff, if believed, was sufficient to support a finding that the accident was the proximate cause of death.

Appellant further contends that the court erred in giving certain instructions requested by plaintiff. It argues that those instructions took from the consideration of the jury the two material issues in the case, namely, whether death resulted directly from accidental means, and whether death resulted directly from disease. It also argues that those instructions made issues of law of those issues of fact; and that by said instructions the trial court directed the jury to return a verdict for plaintiff if it found that disease was not a proximate cause of death, regardless of whether it found that injury by accidental means was the proximate cause of death. The instructions so referred to are as follows:

 Instruction 26 stated, in part: ". . . that Mr. Happoldt's death did not result directly or indirectly from bodily or mental infirmity . . . or disease of any kind, so as to bar recovery under this policy, if his death was the proximate result of a fractured hip sustained through accidental means . . . which aggravated or awakened a previously existing bodily infirmity or dormant ailment . . . from which death resulted."

 Instruction 29 was as follows: "If you find that the accident, if any, operating upon an unhealthy body causes injury putting in motion a chain of events which can be traced to the accidental injury, the accident may be the proximate cause of death. In other words, a recovery may be had even though a diseased or infirm condition appears to actually contribute to the cause of death, if the accident sets in progress the chain of events leading directly to death, or if it is the prime or moving cause."

 Instruction 31 stated in part: "You have been elsewhere instructed that if the death of Mr. Happoldt was proximately caused by a diseased condition of the heart or lungs which pre-existed and continued after the fracture of his hip, your verdict must be for the defendant. However,

in this connection, you are further instructed that notwithstanding the fact that Mr. Happoldt, before he suffered a fracture of his hip, may have had a diseased condition of the heart, if you so find, or chronic asthma, and that such condition was a remote and not a proximate cause of his death, or that the accident in which he sustained such fractured hip acted upon such diseased condition so as to set in motion a chain of events which led to and proximately caused Mr. Happoldt's death, then in either of those cases, your verdict must be in favor of the plaintiff, providing, of course, you also find that the fractured hip was caused by accidental means.''

Instruction 32 stated in part: ''If an injury to a person effected through accidental means proximately causes to be set in progress disease, infection or other conditions which in natural and continuous sequence operate directly to cause death, the death is considered to have resulted from bodily injury effected through accidental means. This is true, although at the time of the injury the person is so weakened and debilitated by some pre-existing infirmity or disease that he is less able to withstand the effect of the injury and the other conditions which are the proximate result of the injury. Under such circumstances if the pre-existing infirmity does not operate directly to cause the death, but merely renders the person less able to combat the disease or conditions which are the natural and proximate result of the injury itself, the pre-existing infirmity is merely a condition, and the accidental injury is the proximate cause of death.''

Instruction 33 stated in part ''. . . under the language of the policy in this case, a recovery may be had by the plaintiff if you are satisfied from a preponderance of the evidence that even though the decedent was afflicted with a pre-existing disease prior to the accident but that the accident set in motion the events that resulted in his death, such accident would be the proximate cause of his death resulting directly and independently and exclusively from all other causes from bodily injuries effected solely through . . . accidental means, but excluding death resulting directly or indirectly from bodily or mental infirmities or illness or disease of any kind.''

Those instructions did not take from the consideration of the jury any issue of fact. In each of the instructions the jury was directed, in substance, to find as a fact whether the accident was the proximate cause of death. It is to be noted

that each of those instructions included words to the effect that if the jury found certain facts then the verdict should be for plaintiff. For example: instruction 26 stated in part, "If his death was the proximate result of a fractured hip"; instruction 29 stated, "If you find that the accident" put in motion a chain of events; instruction 31 stated, "If you so find" and "provided, of course, you also find"; instruction 32 stated, "If injury . . . effected through accidental means proximately causes to be set in progress disease"; instruction 33 stated, "If you are satisfied from a preponderance of the evidence." Under those instructions the jury was required to determine, among other things, whether the hip injury was caused by accident, and whether such accident, if any, was the proximate cause of death. ▮ The court did not err in giving those instructions. In the case of *Brooks* v. *Metropolitan Life Ins. Co.*, 27 Cal.2d 305 [163 P.2d 689], which was an action on an accident insurance policy, the policy insured against bodily injuries caused directly by accidental means, and it provided for double indemnity if the injuries be received "in consequence of the burning of any building in which the insured shall be at the commencement of the fire"; and it provided that the insurance should not cover suicide, nor death caused by disease or mental infirmity. The insured in that case, who was confined to his bedroom by reason of an incurable disease, died in a fire which started in his bedroom. Defendant therein contended that the insured had committed suicide, and that there was no liability under the policy because it did not appear that disease and mental infirmity did not in some measure contribute to the cause of death. After verdict and judgment for the defendant therein, the trial court granted a new trial on the ground of insufficiency of evidence; and on appeal the order granting a new trial was affirmed. In that case the Supreme Court said, at page 309: ". . . that the presence of preexisting disease or infirmity will not relieve the insurer from liability if the accident is the proximate cause of death; and that recovery may be had even though a diseased or infirm condition appears to actually contribute to cause the death if the accident sets in progress the chain of events leading directly to death, or if it is the prime or moving cause."

▮ Appellant also contends that the instructions above referred to (Nos. 26, 29, 31, 32 and 33) were in conflict with instructions Nos. 25, 27, and 30, which were given at his request. Instruction 25 stated in substance that plaintiff was

entitled to recover "only if the death" resulted from bodily injuries "effected solely" through accidental means. Instruction 27 stated: ". . . that if the plaintiff in this case has established by a preponderance of the evidence not only the fact of the accidental injury but the sufficiency thereof to cause death, independently and exclusively of all other causes, and if the testimony in reference to pre-existing disease fails to establish such disease as an indirect or contributory cause of death, then plaintiff can recover. However, there can be no recovery under the policy sued upon in this action for death caused partly by disease and partly by accidental injury. If, therefore, you find that the death of Mr. Happoldt was caused partly by disease, your verdict must be in favor of the defendant." Instruction 30 stated in substance that in order for plaintiff to recover she must prove that the fracture of the hip was the cause which, in natural and continuous sequence, produced death, but that if the jury found that death would have occurred, in any event, at or about the same time it did occur, as the result of diseases from which he was suffering before and after the accident, the verdict must be for defendant. It appears that the first group of instructions directed the jury to the effect that preexisting disease will not relieve the insurer from liability if the accident was the proximate cause of death, and that a recovery may be had by plaintiff even though a diseased condition appears to actually contribute to the cause of death if the accident sets in progress a chain of events leading directly to death; and it appears that the second group of instructions above mentioned directed the jury to the effect that there could be no recovery if the death was caused partly by disease and partly by accidental injury. The instructions in the first group correctly stated the law. (*Brooks* v. *Metropolitan Life Ins. Co., supra,* 27 Cal. 305.) ▮ The instructions in the second group, which were requested by appellant, were not correct instructions and were more favorable to the appellant than it was entitled to. It is true, as appellant argues, that it cannot be determined which group of instructions the jury followed. It appears, however, since the verdict was for plaintiff, that irrespective of which group of instructions the jury followed, its finding was either that the hip injury was the sole proximate cause of death; or that, even though a preexisting disease appeared to contribute to the cause of death, the hip injury set in progress a chain of events leading directly to death. If the jury followed the in-

structions in the first group, it followed correct and full instructions with reference to preexisting disease. If the jury followed the instructions in the second group, it followed instructions which were not a correct and full statement of the law regarding preexisting disease, in that, those instructions did not give plaintiff the benefit of the law regarding preexisting disease as stated in the case of *Brooks* v. *Metropolitan Life Ins. Co., supra.* The two groups of instructions were not prejudicially conflicting. If the verdict was based on the first group of instructions, the appellant was not thereby prejudiced for the reason the instructions were correct statements of the applicable law. If the verdict was based on the second group, appellant was not thereby prejudiced for the reason the instructions were more favorable to appellant than it was entitled to. A statement in the case of *Fassett* v. *Nascimiento,* 108 Cal.App. 14 [291 P. 269], relative to alleged conflicting instructions, is applicable herein. In that case the court gave two correct instructions to the effect that if plaintiffs, husband and wife, were entitled to recover, they were entitled to consequential damages; and it gave a third instruction, which was erroneous, to the effect that if the wife was entitled to recover damages, she was not entitled to consequential damages. The consequential damages therein amounted to $892.60, and the verdicts therein were $9,000 for the wife, and $1,800 for the husband; and it was contended that by reason of the conflict in the instructions it could not be determined whether consequential damages were included in the award to the wife. The court therein said (p. 20) : "[T]he third instruction [the erroneous one to the effect that the wife could not recover consequential damages] was far more favorable to appellant than he was entitled to, and he cannot be heard to complain of it or of any conflict, apparent or real, created by it, especially since it was given at his request."

Appellant's further contention that the court erred in refusing to give instructions F, G, and H, which appellant requested, is not sustained. Those proposed instructions stated in substance that plaintiff had the burden of proving by a preponderance of the evidence that death did not result directly or indirectly from illness or disease of any kind. The court correctly instructed the jury as to the meaning of the expressions "burden of proof" and "preponderance of the evidence." It also gave an instruction to the effect that one who asserts the affirmative of an issue has the burden of

proving his allegation by a preponderance of the evidence. It also gave the following instruction: "In order to recover accidental death benefits under this policy plaintiff must prove by a preponderance of the evidence that the death of Mr. Happoldt was the result, directly, independently, and exclusively of all other causes, from injuries effected solely through external, violent, and accidental means." It also gave the following instruction: "[T]he burden is upon plaintiff to prove affirmatively that the accident, if any, is the proximate cause of death, and, therefore, unless you find that the fractured hip which occurred approximately one month before Mr. Happoldt's death was and is in fact the proximate, prime, or moving cause of his death or that it set in progress the chain of events leading directly to his death, your verdict must be in favor of the defendant." It therefore appears from the instructions just referred to, and from the instructions hereinabove referred to, that the jury was adequately instructed on the subject of burden of proof and preponderance of the evidence.

Appellant also contends that the trial court impaired the obligation of the insurance contract, and deprived defendant of its property without due process of law, in violation of the federal Constitution. Its argument is that the trial court, in giving an instruction based upon the case of *Brooks* v. *Metropolitan Life Ins. Co., supra,* did in effect rewrite appellant's insurance contract. He asserts that if the Brooks case (decided in 1945) overruled previous decisions in this state "with respect to insurance policy exclusion clauses covering contribution of disease or bodily infirmity," then it was error to apply the Brooks case herein to the insurance contract and the indemnity rider which were made in 1925 and 1926. Appellant asserts that the case law, at the time the insurance contract and rider were made, was that where a contract of insurance limits the liability for accidental death benefits, by expressly excluding death which is caused directly or indirectly by disease, there can be no recovery if the plaintiff fails to sustain the burden of proving that disease did not contribute to death. In support of that assertion appellant cites the following cases: *Rock* v. *Travelers' Insurance Co.,* 172 Cal. 462 [156 P. 1029, L.R.A. 1916E 1196] ; *Clarke* v. *New Amsterdam Casualty Co.,* 180 Cal. 76 [179 P. 195] ; *Kellner* v. *Travelers' Ins. Co.,* 180 Cal. 326 [181 P. 61] ; and *Ogilvie* v. *Aetna Life Insurance* Co., 189 Cal. 406 [209 P. 26, 26 A.L.R. 116]. The Brooks case holds, as above shown,

that the presence of preexisting disease will not relieve the insurer from liability if the accident is the proximate cause of death, and that recovery may be had even though a diseased condition appears to actually contribute to cause the death if the accident sets in progress the chain of events leading directly to death. Under the Brooks case, and the cases cited by appellant, the plaintiff is required to prove that the accident is the proximate cause of death. It therefore appears that, under the case law of California at the time of trial and at the time the contract was made, a plaintiff was required to prove that the accident was the proximate cause of death. Furthermore, the contract and the rider were made in New York where the defendant's home office was located and where the insured and plaintiff resided. Under such circumstances, it would seem that the defendant did not contemplate the case law of California, regarding procedure, in determining the provisions of its proposed contract with the insured. Appellant's contention, relative to impairment of the obligation of the contract and due process of law, is not sustained.

 Appellant contends further that one of the attorneys for plaintiff, who tried the case, was guilty of prejudicial misconduct. During a recess on the first morning after the jury had been selected, several jurors were standing in a group in the corridor adjoining the courtroom, and the trial attorney for plaintiff, and others, were also in the corridor. The jurors were near the only window in the corridor. The attorney went to a place near the window, and one of the jurors spoke to him and said that the attorney resembled a certain motion picture actor, and then the attorney and the jurors laughed, and "a few bantering remarks were exchanged." Defendant's attorney, who had gone into the corridor and observed that incident, then walked toward the courtroom and requested plaintiff's attorney to go with him. The attorneys went into the chambers of the trial judge, and reported the incident to the judge. The attorney for defendant did not at that time make a motion for a mistrial, but stated that he desired to call the matter to the attention of the court. The trial judge commented upon the inadequacy of facilities for the jurors, the fact that it was impossible to pass through the corridor without coming into contact with the jurors, and that some pleasantries in no way related to the case might be countenanced to avoid discourtesy; and he stated that he was of the opinion that no harm had been done, but

that he would admonish the jury to disregard the incident. The attorney for defendant then stated that he did not think such admonition was necessary. At the opening of the afternoon session of the trial, defendant's attorney made a motion for a mistrial. The trial judge denied the motion, stating that he was still of the opinion that the incident did not constitute misconduct which would be the basis for a mistrial, and that no prejudice resulted. The trial judge was in the best position to determine whether the alleged misconduct of counsel had any prejudicial effect upon the jury. The conclusion of the trial judge in such a matter should not be disturbed on appeal "unless, under all the circumstances appearing, it is plainly wrong." (*LaFargue* v. *United Railroads*, 183 Cal. 720, 724 [192 P. 538], and *Walling* v. *Kimball*, 17 Cal.2d 364, 369 [110 P.2d 58].) The incident was inconsequential and did not amount to misconduct.

Appellant also contends that the court erred in amending the judgment "so as to include legal interest from February 8, 1946." As above shown, the jury returned a verdict in favor of plaintiff for $25,000 on June 30, 1947. Judgment upon the verdict was entered on July 1, 1947, for $25,000 "with interest thereon at the rate of seven per cent per annum from the date of the verdict until paid." On July 31, 1947, plaintiff filed a notice of motion to amend said judgment to include interest on said amount at the rate of seven per cent per annum from February 8, 1946. The motion was granted on August 13, 1947, and the judgment was amended by inserting in the judgment, after the amount "$25,000.00" the following words: "to include legal interest from February 8, 1946." The amended judgment, in the part material here, read as follows: ". . . that said plaintiff . . . recover . . . the sum of $25,000.00 to include legal interest from February 8, 1946; with interest thereon at the rate of seven per cent per annum from the date of the verdict until paid . . .." The policy provided that the face amount of said policy, $50,000, should be payable "upon receipt at said Home Office of due proof of death." The agreement for the additional $25,000 for death from accident, attached to the policy, provided: "If said policy shall become a claim by the death of the insured . . . and due proof shall be furnished to the Company at its Home Office in the City of New York that such death resulted directly, independently and exclusively of all other causes from bodily injuries effected solely through external, violent and accidental means, . . ." the $25,000

"will become payable under this agreement in addition to and together with the face amount of said policy . . .."

If the right to recover a certain amount of money is vested in a person upon a particular day, he is entitled to recover interest thereon from that day. (Civ. Code, § 3287; *Canavan* v. *College of Osteopathic P. & S.,* 73 Cal.App.2d 511, 521 [166 P.2d 878].) In the present case, if there was liability on the part of defendant under the additional agreement, plaintiff was entitled to recover the principal sum of $25,000 and interest thereon from the day due proof was furnished to the defendant at its home office that death resulted from accidental means. If, as a matter of law, the plaintiff herein was entitled to recover interest on the $25,000 from a particular date prior to the verdict, the trial judge was empowered to include in the judgment, entered upon the verdict, a provision for such interest. (*Engelberg* v. *Sebastiani,* 207 Cal. 727, 729-730 [279 P. 795].) In the present case, as above shown, the verdict did not include a provision for interest, but the judge, on August 13, 1947, amended the judgment which had been entered upon the verdict of June 30, 1947, to include a provision for interest from February 8, 1946. The question arises as to whether, as a matter of law, plaintiff was entitled to interest from said February 8th, or whether the matter of interest was an issue of fact for the jury. Respondent (plaintiff) asserts in effect that as a matter of law she was entitled to interest from that date. She states as follows: "Notice in writing, on defendant's proof of loss form, of the death of the insured was *mailed* by plaintiff to defendant on February 8, 1946, and *that condition of the insurance contract* having been met on said date, thereupon the sum of $25,000.00 additional indemnity became due and payable." (Italics added.) It does not appear, however, as shown above, that *mailing* of notice of death was compliance with any condition of the additional agreement that was required to be fulfilled in order to fix the date when the additional amount for death "from accidental means" should become payable. The provision of the additional agreement which fixed such date was as follows: "If . . . due proof shall be furnished to the Company at its Home Office . . . that such death resulted . . . from bodily injuries effected solely through . . . accidental means . . .." The plaintiff alleged in paragraph VII of her complaint that after the death of the insured she gave written notice to the

defendant, upon forms duly furnished by defendant, of the death of the insured, of her relationship to the insured, of her interest in the policy, of all facts and circumstances surrounding the death of the insured, and of the occupation, habits, health, and all particulars pertaining to the insured at the time of his death; and that said written notice and forms required by the defendant were *mailed* to the defendant on February 8, 1946. The complaint did not allege when due proof was furnished to defendant at its home office that death resulted from accidental means, but it did allege, as above shown, that written notice of the death was *mailed* to the defendant on February 8, 1946. The defendant expressly admitted, in answering paragraph VII of the complaint, that during the month of February, 1946, it received from plaintiff certain written notices of the death of the insured; but it denied generally and specifically the other allegations of said paragraph VII. That admission in the answer, that it received from plaintiff during the month of February, 1946, certain written notices of the death of the insured, was not an admission that due proof that death resulted from accidental means was furnished to the defendant at its home office on February 8th, or at all during February, 1946, or at any time. The answer, as above shown, denied all the allegations in paragraph VII regarding the information alleged to have been in the notice of death, and it denied the allegation that the notice of death was mailed on February 8th. The record does not show that it was undisputed that due proof that death resulted from accidental means was furnished defendant at its home office on February 8, 1946, or on any other date. It does not appear that, as a matter of law, plaintiff was entitled to interest from any particular date prior to the verdict. It was a question of fact for the jury as to whether interest should be included in the verdict. It was error to amend the judgment of July 1, 1947, to include interest from February 8, 1946.

It is ordered that the amendment of the judgment, which amendment was made on August 13, 1947, in words and figures as follows: ''to include legal interest from February 8, 1946;'' be and the same is stricken from the judgment. The judgment as originally entered on July 1, 1947, is affirmed. The minute order herein dated August 13, 1947, and entered on August 20, 1947, which is as follows: ''Plaintiff's motion to amend judgment heretofore submitted is now granted so

as to include legal interest from February 8, 1946." is vacated and set aside. The superior court is directed to make and enter an order denying plaintiff's motion to amend the judgment, which motion was filed on July 31, 1947. Each party to pay his own costs on appeal.

Shinn, P. J., and Vallée, J., concurred.