[Civ. No. 4715. Fourth Dist. Jan. 26, 1954.]

EMMA B. WHARTON, Respondent, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA (a Corporation), Appellant.

Adams, Duque & Hazeltine, Henry Duque and Robert W. Driscoll for Appellant.

Tobias & Bernard for Respondent.

BARNARD, P. J.—This is an action to recover on an insurance policy. The policy, issued on August 1, 1947, insured the life of Joseph E. Wharton, with an additional benefit in the event of death by accidental means. Wharton died on April 4, 1950. The life insurance was paid, but the defendant refused to pay the accident insurance, contending that death was not caused by accidental means within the meaning of the policy. A jury returned a verdict in favor of the plaintiff and the defendant has appealed from the judgment, from an order denying its motion for a directed verdict, and from an order denying its motion for judgment notwithstanding the verdict.

The policy provided for the payment of the accident insurance upon "due proof that the death of the insured occurred as a result, directly and independently of all other causes, of bodily injuries effected solely through external, violent and accidental means," subject to the further provision that no such benefit shall be payable if such death results "directly or indirectly from bodily or mental infirmity or disease in any form, or medical or surgical treatment therefor."

The plaintiff was the wife of Wharton, and both were

doctors. They moved to Santa Ana in September, 1947, and Wharton began a medical practice there. In November, 1948, a psychiatrist, who made a diagnosis of chronic alcoholism with dependency on barbiturates and general exhaustion and anxiety, sent him to a sanitarium where he remained from November 29th to December 19th. He returned to the sanitarium on January 7, 1949, and stayed until January 11, 1949.

On January 6, 1950, Wharton was committed to the Orange County Hospital based on an affidavit of intemperance signed by the plaintiff. On January 10th, a nurse in that hospital heard a cry from Wharton's room. She ran downstairs and found him on the floor of his room having, apparently, "a grand mal convulsion." His face was rather purple, he was frothing slightly, and his body was shaking and convulsing. After regaining consciousness he complained of a pain in his shoulder but the X-rays revealed no fracture or dislocation. This nurse testified that she had had considerable experience in treating alcoholics with convulsions, and that some of them do not realize that they are going into a convulsion. On January 13th, while still in the hospital, Wharton suffered from delirium tremens and had to be restrained. He was discharged from the county hospital on January 20, 1950, on the suggestion that he had cleared up mentally and that further hospitalization would not be beneficial. On that day, the court continued the intemperance proceeding for six months on condition that he refrain from the use of intoxicants. Shortly thereafter, he started drinking again and on March 30, 1950, the court committed him to the Norwalk State Hospital for a period of two years, as an alcoholic person.

The doctor who examined Wharton on his admission to Norwalk on March 30th, testified that he appeared to be on the verge of delirium tremens; that he appeared undernourished, run down and shaky, but was cooperative; and that on March 31st, he appeared to be still shaky, so he arranged to have him transferred to the medical ward of the hospital. Another doctor examined him that day and found that he was in general good physical condition except for "arterial hypertension and vasomotor instability," probably due to a postalcoholic state. At 2 p. m. on March 31st, his condition was such that he was allowed to be up and dressed. On the morning of April 1, 1950, he was up and dressed and

was in the recreation room of this ward where other patients were playing cards and other games. About 9:40 a. m. the medical director of the hospital came into the room and talked with him for a couple of minutes. He noted that Wharton seemed nervous but otherwise normal and rational. As this doctor left the room he heard a thump or a thud, but did not return. The ward attendant saw this doctor talking to Wharton but did not hear the conversation. After this doctor left, Wharton went over to a table to watch a game being played by other patients, and the ward attendant went to another table and stood with his back to Wharton. While they were thus standing, from 6 to 8 feet apart, this attendant heard a scream and turning saw Wharton, who was turned slightly away, in the process of falling over backward. Wharton hit the floor before the attendant got to him. The attendant described the fall as something like a rigid backward fall, and testified "he didn't just crumple to the floor, it was more of a fall," and that he did not see Wharton trip, stumble or slip, nor did he see anyone push him. On the hospital records the incident was described as follows:

"Remarks: 4/1/50 9:45 convulsion, falling on floor. Injured hip. Sent to x-ray."

"Physician's Report: About 9:45 a. m. he had a convulsion during which he fell heavily, fracturing the proximal end of the right femur."

The report to the county coroner stated: "On April 1, he was up and dressed, ate fairly well, and at 9:45 a. m. he suddenly developed a grand mal type of seizure and fell to the floor."

The attendant testified that after Wharton fell he was in tremor "threshing around," that his complexion was blue, and that a little froth was coming from his mouth. X-rays were taken which disclosed a comminuted intertrochanteric fracture of the femur. An orthopedic physician, who saw him at 3:30 p. m. on April 1st, testified that at that time Wharton was very nervous but appeared to be in fairly good shape. Later that day, he had projectile vomiting and continued to be quite confused and hyperactive. During the early part of April 2d, his condition was fairly satisfactory. On the morning of April 3d, he tried to get out of bed and fell to the floor. During that day, he was confused, unable to cooperate, restless and jittery, and developed marked increase in motor activity, requiring force to keep him in bed. He did not respond to a sedative and from 6:45 to 11:30 p. m.

was reported to be "continuously in seizure." He quieted down about 11:30 p. m., and at 12:05 a. m. he died. During the interval, Wharton told his wife that he had no recollection of what had happened after he had talked to the doctor in the recreation room until he woke up in the X-ray room.

A doctor who had examined Wharton on March 31st, stated that Wharton's projectile vomiting after the fall was due to increased brain pressure, possibly caused by fatty emboli which could be fatal, and that his hyperactivity could be compatible with shock. While he expressed no opinion as to the cause of death, he suggested that fatty emboli should be considered in that connection. Another doctor, who had treated hundreds of femur trauma cases, in response to a hypothetical question, expressed the opinion that the primary cause of death was the fracture of the femur, and that there were three possibilities as to the immediate cause of death: shock, fatty embolism and delirium tremens. He further stated that had Wharton not fractured his leg he would not have died, since then the delirium tremens would not have played a fatal role and there would have been no shock or fatty embolism, and that it was the fracture which "set in train a set of circumstances which terminated in Doctor Wharton's death." Another doctor, an orthopedist with considerable experience in the treatment of fractures of the femur, was of the opinion that Wharton "died as a result of secondary shock or fatty embolus or emboli or a combination of those factors, or possibly complete cardiac arrest from exhaustion, all factors being the secondary result of his fractured femur." He further testified that this was a bad fracture; that he had seen close to a hundred fractures of this type in people of Wharton's age group (around 35 years), and that of these between 10 and 15 per cent had died as a result of such fracture setting in motion a series of events consisting of fatty emboli and secondary shock; that he found no evidence of a convulsive fracture; that the X-rays revealed that the force causing the fracture was a force from the side; that Wharton would have had to fall in such a way as to strike his hip; and that he would have to fall so that the outer thigh would strike first. This doctor also explained that in such a fracture blood vessels are broken around the fracture site; that from this condition fatty emboli are apt to get into the blood stream; and that they are then carried to various organs, including the brain, and can be fatal if

they lodge at critical points. He also explained why the presence of fatty emboli might not be discovered in making an autopsy.

The autopsy surgeon expressed the opinion that death was caused by fatty degeneration of the liver, due to alcoholism. He testified that the liver appeared to the naked eye to be entirely damaged; that he did not consider that the fracture had played any part in Wharton's death because he did not find any evidence to that effect; that there was sufficient medical and pathological evidence for this man to have died "whether suddenly or gradually or rapidly, from his pre-existing medical conditions, regardless of whether or not he had had or had not had the fracture." He further testified that he thought Wharton died of the various disease processes that were present, rather than from the fracture, and that "according to my interpretation of the history, the fracture did not start the series of events, the series of events was started by the onset of a convulsion." He further testified that he had been able to find no fatty emboli. When asked to explain why Wharton had suffered no injury in his previous fall at the county hospital, but had died within 60 hours of his fall at Norwalk, he said that Wharton's fatty degeneration had grown worse in that period and had reached "a point which is what we call irreversible," and that the second "was the crucial episode."

Another doctor, who reviewed the hospital records and the autopsy report, expressed the opinion that the cause of death was fatty degeneration of the liver, alcoholic. Another doctor, the orthopedic physician who treated Wharton after his fall, testified that he was told that Wharton had fractured his hip as a result of the convulsion alone; that he was not told of the fall; that this fracture was of a serious type which is usually seen in elderly people; that the younger people he had seen with this type of fracture had usually been involved in auto accidents; that he had occasionally seen it in young people who had had shock treatment; that he had never seen death from such a fracture without some added cause; that such a fracture could happen in many ways, and could be caused by a convulsion; that such a fracture results from an abnormal leverage or pressure which twists the femur; that there was "more apt to be a twisting type of injury" to cause such a fracture; that such a fracture could come from a rigid fall backward if one leg falls under the other leg in such a way that there is torsion placed on

the body; that "there has to be a torsion-type of force"; and that he did not know whether or not this patient would have died if the fracture had not occurred. The psychiatrist who examined Wharton upon his admission to Norwalk and observed him several times later, was of the opinion that the cause of death was fatty degeneration of the liver. He further testified that this fatty degeneration was produced by excessive alcoholism over a long period of time; that the fracture also contributed to his death to some extent; that the immediate cause of death was exhaustion from the "D.T.'s" and alcoholism; that the fracture "is the thing that broke the camel's back, but it is my opinion that he would have died even if he didn't have the fracture"; and that "It would have been possible that if he went into the D.T.'s, if he didn't have the fracture, the D.T.'s might have lasted a few days and he would have exhausted himself on the following day or two days or three days later."

The appellant contends that the evidence is insufficient to support a verdict that this death occurred as a result, directly and independently of all other causes, of bodily injury effected solely through external, violent and accidental means; and that the evidence clearly shows that death resulted directly or indirectly from bodily or mental infirmity in that the cause of the fall was disease, an alcoholic convulsion.

It does not conclusively appear that a convulsion caused the fall, or even that a convulsion preceded the fall. The evidence shows some signs of a convulsion after the fall but there is nothing, aside from a possible inference, to show when it started. Wharton may have slipped or tripped, have cried out and tried to save himself, and the convulsion, if any, may have followed the fall. It is true that something occurred before the fracture, and that in one sense the fracture did not start the "series of events." Even if the series of events was started by the "onset" of a convulsion that fact is not necessarily controlling. The evidence justified the inference that the immediate cause of death was one or more of the effects of the fracture, and that the fracture was caused by the fall. The most important question is not what started the series of events but what caused the fall. Whatever caused the fall would reasonably be considered as the prime or moving cause of the death. If the fall resulted solely or directly from a convulsion caused by Wharton's physical and mental condition, as argued by the appellant, the resulting death would not be caused by accidental means

within the meaning of the policy. If the fall resulted from something else, it might well involve such accidental means. If the fall was caused by an accident which was the proximate cause of death, the mental and physical condition of the deceased would not be controlling, even though it caused a convulsion.

In *Brooks* v. *Metropolitan Life Ins. Co.*, 27 Cal.2d 305 [163 P.2d 689], where similar terms of a policy were involved, the court said:

"On the other hand there is authority for what in our opinion is the correct rule, that the presence of preexisting disease or infirmity will not relieve the insurer from liability if the accident is the proximate cause of death; and that recovery may be had even though a diseased or infirm condition appears to actually contribute to cause the death if the accident sets in progress the chain of events leading directly to death, or if it is the prime or moving cause."

In that case, as here, there was no direct evidence of the accident itself. Since conflicting inferences could be drawn from the circumstances shown it was held that it could not be said, as a matter of law, that the evidence compelled the conclusion contended for by the insurance company. A similar situation was involved in the case of *Happoldt* v. *Guardian Life Ins. Co.*, 90 Cal.App.2d 386 [203 P.2d 55], where no evidence is set forth as the cause of the fracture, and the medical evidence was conflicting. The question in such a case is what caused the death at that particular time, and not whether something existed which would otherwise have caused death at an early future date.

It cannot be said here, as a matter of law, that the evidence conclusively shows that this fall resulted from a convulsion without the intervention of any accident. The question was one of fact, and an inference that an accidental fall occurred may reasonably be drawn. No one saw the beginning of the fall or the beginning of the convulsion. Whether the convulsion was sudden and complete or came on slowly and partially, and whether it preceded or followed the beginning of the fall is not disclosed by the evidence. There is evidence that a patient sometimes realizes that an alcoholic convulsion is coming on. There are many conflicts in the evidence, including the medical evidence. There is expert evidence that death resulted from the fracture and the effects caused thereby, and other expert evidence that death resulted from the condition of the deceased's liver. Not

only was this evidence conflicting, but there was no direct evidence to show what caused the fall, and the jury may well have refused to accept the implied conclusion of some of the doctors that the fall was caused by a sudden convulsion, without further acts or incidents.

While the evidence is conflicting, some of the evidence as to Wharton's condition prior to this incident would throw considerable doubt on the other evidence, and make it seem unlikely that his condition was such that death could be expected almost momentarily. Wharton had had a similar fall less than three months before with no serious results. In each case no one saw the beginning of the fall but a sharp cry was heard, which would indicate that in each case Wharton knew that something was happening to him. In such a case, a person would naturally take a step, try to grab something or endeavor in some way to protect himself. In the first fall in January Wharton may have taken some action with sufficient success to prevent serious injury. In the fall in question, he may have slipped when he started to go somewhere, or he may have slipped or twisted his legs causing the fall, while trying to reach the table near which he stood, in an effort to protect himself when he felt that he was becoming dizzy. This view is somewhat supported by the testimony of one of appellant's doctors, to the effect that this type of fracture is more apt to be caused by a twisting type of injury, and that even if it came from a rigid fall backward there would have to be a twisting, "a torsion type of force." This explanation of the difference between the two falls may have been more persuasive to the jury than the one offered by the autopsy surgeon to the effect that Wharton's condition had deteriorated, in the interval between the two falls, to the extent that he was no longer able to withstand the effects of a fall. In our opinion, the controlling question was one of fact for the jury, and the evidence, with the reasonable inferences therefrom, is sufficient to sustain the verdict.

 The appellant also contends that the court erred in giving the following instruction:

"In this connection you are instructed that if you find from the evidence that the fracture was directly caused by the pulling of the muscles by their contraction due to a seizure —in other words, due solely to the seizure and not due to a fall occasioned by a seizure—that such would not constitute

an accident and your verdict must be for defendant. If, however, you believe from a preponderance of the evidence that the muscle pull of seizure did not itself fracture the femur but that the seizure or something else caused deceased to fall and the force of the fall fractured the femur, you must consider the incident further and apply the rules I shall hereafter state to you to determine whether the injured hip was caused by accidental means.''

Complaint is made only of the last sentence, and it is argued that it was error to permit the jury to consider the incident further if they found that the seizure caused the fall, since there could be no accident where the fall was caused by disease. Even if the seizure caused the fall in the beginning there could still be accidental means, and the instruction merely told the jury that if it did not find that the fracture was caused by a muscular pulling due to a seizure, it must consider the incident further and apply the rules thereafter to be given. No complaint is made of the other instructions which followed, and in view of all the instructions and the evidence as a whole it cannot be held that prejudicial error appears. The jury could not have been misled on the real question presented throughout the case, which was whether death resulted from a convulsion, in effect while Wharton was unconscious, or from a fall growing out of some action on his part.

The judgment and orders are affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied February 16, 1954, and appellant's petition for a hearing by the Supreme Court was denied March 25, 1954.