[Civ. No. 41955. Second Dist., Div. Four. May 29, 1974.]

RAMONA NASH, Plaintiff and Appellant, v.
PRUDENTIAL INSURANCE COMPANY OF AMERICA,
Defendant and Respondent.

**COUNSEL**

Low & Cashion and Elmer Low for Plaintiff and Appellant.

Adams, Duque & Hazeltine, James L. Nolan, and James H. Fleming for Defendant and Respondent.

**OPINION**

**JEFFERSON, J.**—Plaintiff Ramona Nash brought this action to recover $50,000 in benefits payable by the terms of a group accident insurance policy issued by defendant The Prudential Insurance Company to the California Institute of Technology, the employer of plaintiff's husband, Leroy W. Nash. Nash was insured under the policy and died June 23, 1968, in the ocean near Catalina Island. Plaintiff beneficiary contended at the jury trial that Nash met his death by accident. Defendant attributed the death to disease, having pleaded that it was not liable for the loss because death caused by disease was excluded by the policy's terms. The jury returned a verdict for the defendant. Plaintiff has appealed the judgment.

Our factual recital contains, as it must, the evidence most favorable to the defendant insurer. (6 Witkin, Part I, Cal. Procedure (2d ed. 1971) Appeal, §§ 248, 249, pp. 4240-4241.)

On June 23, 1968, the insured, a tall, heavy, 45-year-old man, boarded a 79-foot chartered yacht, the *Te Amo,* at Long Beach Marina for a day's excursion to Catalina Island. He was accompanied by his wife (the plaintiff), and approximately 30 other persons. The party left the mainland about 7 a.m. While at sea, about 10:30 a.m., Nash complained of feeling queasy. After lying down for a time, he had something to eat and rejoined his wife and friends, apparently feeling well. A bar had been set up on board and Nash had some drinks. At about 2:30 p.m., the yacht

began the trip back to Long Beach and was about a mile from Catalina Island. It was not under sail, as there was not enough wind. The sea was calm. Nash was near the rail of the vessel; in one hand he held a drink and in the other a rope attached to the vessel. There was testimony by one witness that his arms went up in the air in back of him suddenly, and he fell over the railing into the ocean, still holding the rope. There was testimony that he laughed while attempting to climb back aboard; he failed, and then dropped into the water and started to swim. Someone shouted, "Man overboard" and a life raft was thrown into the sea. The yacht circled back to retrieve Nash. A number of persons observed him swimming toward the raft and shouted encouragements to him to continue. One witness testified that he swam a few strokes. Other evidence indicated he swam for a longer time. Just prior to reaching the raft, his arms straightened out in front of him and his head went down. Observing this, some men in the party dove into the water and managed to haul Nash on board. Resuscitation was attempted, but Nash was dead.

An autopsy was performed. The death certificate, signed by Dr. William Arterberry, the deputy coroner who had conducted the autopsy, described the cause of death as occlusive coronary atherosclerosis with thrombosis. Dr. Arterberry testified at trial that his examination revealed that the deceased had had an unusually enlarged, diseased heart and severe coronary artery disease. The coronary artery disease was evidenced by the "patchy" narrowing (up to 80 percent) of all three major coronary vessels, a condition known as "triple vessel disease." The pathologist was of the opinion that the "severe occlusive atheromatous changes" he observed had been developing for many years. The specific cause of death was a clot which had closed the right coronary artery of the heart.

Medical records of Nash's personal physician, Dr. Novak, disclosed that Nash had suffered from, and had been treated for, hypertension, or high blood pressure, in 1963. Evidence was admitted, over plaintiff's objection, that because of this, the deceased had been denied life insurance on two occasions since 1963.

The group policy at issue herein provided for the payment of benefits if the insured "sustains accidental bodily injuries and . . . suffers the loss of life . . . as a direct result of such injuries and independently of all other causes." Expressly excluded from coverage was loss "(b) directly or indirectly from bodily or mental infirmity or disease or medical or surgical treatment thereof."

Defendant Prudential offered the testimony of an expert cardiologist, Dr. Travis Winsor, who had never personally examined the deceased. He

testified that Nash's death was directly caused by heart disease. Dr. Winsor stated that it was his opinion that the clot which occluded the coronary artery of the deceased had started to form in the middle of the morning on June 23, when Nash complained of feeling queasy. He said that clots take time to form; that it was possible for Nash to temporarily recover from discomfort, to drink and socialize, appearing perfectly normal to others while this formation was in process. However, by 2:30 p.m., according to the expert, the occlusion caused a convulsion which propelled Nash into the water. Dr. Winsor explained that Nash's laughing attempt to hoist himself back on the yacht was not actually what it seemed to be to those observing the incident; his facial expression was probably contorted into a grimace known as "risus sardonicus," evidence of a convulsive state. Dr. Winsor maintained, in addition, that it was possible for a person in the throes of a fatal thrombosis to swim some distance before final collapse. Under cross-examination Dr. Winsor conceded that he knew of no specific data in medical literature reporting a similar incident, but that his opinion of what had actually happened to Nash remained unchanged. He concluded that Nash's fall from the railing took place during the fatal coronary occlusion, which was the primary proximate cause of death. Dr. Winsor rejected the theory that the occluding clot could have been formed as the result of the rupture of a small blood vessel after the insured had accidentally fallen into the ocean during a period of stress caused by the circumstances. The basis upon which he rejected this theory was that the pathologist who had conducted the autopsy would have found physical evidence of such a rupture, and had found none.

The opinions offered by Dr. Winsor, and presumably accepted by the jury, were in total conflict with those expressed by the plaintiff's medical expert, an internist, Dr. Miley, who attributed Nash's mid-morning discomfort to seasickness, and theorized that Nash, having accidentally fallen from the railing, experienced sufficient stress as the result of the fall to cause the rupture of a small blood vessel, in turn leading to the formation of the fatal clot.

■ Plaintiff attacks the sufficiency of the evidence supporting the judgment, while recognizing that appellate review of the judgment is limited to a determination of whether the record before us contains substantial evidence in support of the judgment. (See 6 Witkin, cited *supra*.) The testimony of expert witnesses, based on properly admitted evidence or properly framed hypothetical questions, constitutes evidence subject to the same standard of review. (*Ideal Packing Co.* v. *Brice*, 132 Cal.App.2d 582 [282 P.2d 957]; *Huntoon* v. *Hurley*, 137 Cal.App.2d 33 [290 P.2d 14]; *Daly* v. *Wallace*, 234 Cal.App.2d 689 [44 Cal.Rptr. 642].) Plaintiff

argues, however, that an appellate court may reverse a judgment which is supported by "incredible" or "inherently improbable" evidence, and that the case before us reveals such a situation. While it may be within the power of an appellate court to reverse a judgment based upon evidence that no reasonable person could believe (see *Evje* v. *City Title Ins. Co.,* 120 Cal.App.2d 488, 492 [261 P.2d 279], for an abstract discussion of this proposition), we do not agree that the jury arrived at their verdict in the instant case on such evidence. Our review of all of the evidence adduced at trial discloses that, while there was essentially no conflict in the testimony of the lay witnesses' observations that the deceased, except for temporary discomfort, appeared to be in good health up to the moment he fell from the railing, both the cardiologist and the pathologist offered by the defense were in agreement that many persons suffer from coronary heart disease without symptoms or with minor distress attributed to other causes. There is nothing inherently incredible about this situation. The record contains almost no definitive testimony about how Mr. Nash actually physically progressed from a settled position on the *Te Amo* over the side of the vessel. The witnesses that were in the closest proximity had no detailed recollection on that subject. What might have been inferred from such details had they been available would no doubt have had some bearing on the crucial, essentially factual, issue of how and why the fall occurred. When an event must be related to a medical condition, or the absence of one, the finders of fact are necessarily dependent, at least to some extent, on the opinions of experts; the causation issue must necessarily be determined by reliance on knowledge "sufficiently beyond common experience." (Evid. Code, § 801.) It is not uncommon for experts to disagree, and it remains the function of the jury to choose which medical testimony they believe. Plaintiff points out that Dr. Winsor had never treated the deceased, but ignores the fact that his opinions were substantiated by the testimony of the pathologist who actually conducted the autopsy. The jury, properly instructed on the function of expert testimony as it applied to their fact-finding problem, chose to believe them. We conclude that their verdict was supported by substantial, and not inherently incredible evidence.

The trial court instructed the jury that "The existence of a pre-existing disease or infirmity will not relieve the defendant from liability in this case if you find that the accident was the proximate cause of the death of LeRoy Nash. Plaintiff may recover even if the said LeRoy Nash had a disease or infirmity which contributed as a cause of his death if you find there was an accident which set in progress a chain of events which caused death." (*Brooks* v. *Metropolitan Life Ins. Co.,* 27 Cal.2d 305 [163 P.2d 689]; *Slobojan* v. *Western Travelers Life Ins. Co.,* 70 Cal.2d 432

[74 Cal.Rptr. 895, 450 P.2d 271].) This instruction properly stated the applicable law.[1]

Plaintiff contends, however, that the trial court erroneously refused to instruct the jury that the burden of proof was upon the defendant insurer to prove the exclusion contained in the policy to avoid liability, i.e., to prove that Nash died of disease rather than by accident. Plaintiff also directs our attention to the instruction relating to the cause of death, which contains a statement concerning the burden of proof which plaintiff contends is a misstatement of law.[2]

In analyzing this contention it is necessary to start with the language of the policy, which provides benefits only if the insured "sustains accidental bodily injuries and . . . suffers loss of life, sight or limb as a direct result of such injuries and independently of all other causes." This policy provision has been construed in *Brooks, supra,* as follows: "On the other hand there is authority for what in our opinion is the correct rule, that the presence of preexisting disease or infirmity will not relieve the insurer from liability if the accident is *the* proximate cause of death; and that recovery may be had even though a diseased or infirm condition appears to actually contribute to cause the death if the accident sets in progress the chain of events leading directly to death, or if it is *the prime or moving cause.*"

This language, which has been applied in the line of cases cited, *supra* (fn. 1), and which was used in instructing the jury here, explains that the

---

[1]*Happoldt* v. *Guardian Life Ins. Co.,* 90 Cal.App.2d 386 [203 P.2d 55]; *Stokes* v. *Police & Firemen's Ins.,* 109 Cal.App.2d Supp. 928 [243 P.2d 144]; *Miller* v. *United Ins. Co.,* 113 Cal.App.2d 493 [248 P.2d 113]; *Wharton* v. *Prudential Ins. Co.,* 122 Cal.App.2d 857 [265 P.2d 956]; *Johnson* v. *Aetna Life Insurance Co.,* 221 Cal.App. 2d 247 [34 Cal.Rptr. 484]; *Shafer* v. *American Casualty Co.,* 245 Cal.App.2d 1 [53 Cal.Rptr. 446].

[2]The instruction which plaintiff attacks was: "In connection with the question of the cause of death, it is a rule of law that, in order for plaintiff to recover she must prove by a preponderance of the evidence that an accidental bodily injury was the proximate, prime or moving cause of Mr. Nash's death, *and not bodily or mental infirmity or disease.* You will bear in mind the possibility that there can be more than one proximate cause of an occurrence such as death, and you will consider the foregoing instructions in the light of all of the instructions given you in this case." (Italics added.)

Prior to that the court had instructed as follows: "In this action the plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: (1) an accident was sustained by Mr. Nash (2) Bodily injury resulted from said accident (3) That said accident or bodily injury was the proximate, prime or moving cause of Mr. Nash's death, or that it set in progress a chain of events leading directly to the death."

accident may be found to be the proximate cause of death within the meaning of the policy, even though a diseased or infirm condition may have been a contributing cause. (See *Johnson* v. *Aetna Life Ins. Co.*, 221 Cal.App.2d 247, 256 [34 Cal.Rptr. 484]; *Stokes* v. *Police & Firemen's Ins.*, 109 Cal.App.2d Supp. 928, 930 [243 P.2d 144].)

In *Zuckerman* v. *Underwriters at Lloyd's*, 42 Cal.2d 460, at page 466 [267 P.2d 777], the policy covered bodily injury caused by accident "solely and independently of other cause . . . ." The trial court gave a jury instruction which began as follows: " 'Plaintiffs have the burden of proving by a preponderance of the evidence that the death of George H. Francis was not directly or indirectly caused or contributed to by intentional self-injury, disease or natural causes. Futhermore plaintiffs may not recover if the evidence affirmatively shows that intentional self-injury, disease or natural causes caused or contributed to the death of the insured directly or indirectly.' " (Fn. p. 467). The Supreme Court said of this instruction: "The first two sentences of the instruction unduly stress the significance of any contribution to the death of Francis by preexisting disease or intentional self-injury. To that extent the instruction is inconsistent with the rule on causation as laid down in the Brooks case, and as stated to the jurors in several other instructions."

The court decided that, since that instruction had concluded with an admonition to consider all of the instructions as a whole, and since there had been another instruction containing the *Brooks* "chain of events" concept of proximate cause, the jury would be assumed to have applied the law properly.

■ In the case before us a review of the instructions as a whole offers no such assurance that the jury understood and applied the law correctly.

The instruction first given on burden of proof incorporated the *Brooks* rule on causation. The instruction given later did not, except by the general admonition to consider all instructions together. The second instruction (see fn. 2, *supra*), which was requested by defendant and given by the court in modified form, says the plaintiff must prove that an accidental injury was the proximate cause of death "and not bodily or mental infirmity or disease."

This statement is literally true in the sense that where accident is "the proximate, prime or moving cause," then disease is not "the proximate, prime or moving cause." But a layman, not fully appreciating the legal distinction between "the proximate cause" and a contributing cause, might easily interpret the "and not" clause as indicating the plaintiff was re-

quired to prove that disease was not involved. The danger of such a mistake is enhanced by the succeeding sentence which reminds the jurors that "there can be more than one proximate cause of an occurrence such as death." This language would be most confusing to anyone who did not appreciate that the *Brooks* rule rests upon a distinction between "the proximate cause" and a contributing cause.

The mischief is compounded by two additional, and wholly unnecessary instructions requested by defendant and given by the court with some modification. They are:

Defendant's instruction No. 5. "The Group Accident Loss Benefits here involved contains the following provisions which are pertinent and material:

"ACCIDENT LOSS BENEFITS

" 'A benefit under this Coverage is payable, subject to the provisions hereinafter stated, if a Participant, while a covered individual, sustains accidental bodily injuries and, within the Accident Loss Period . . . immediately following the date on which such injuries are incurred, suffers the loss of life, . . . as a direct result of such injuries and independently of all other causes . . . .' "

\*     \*     \*

"Exclusions.—The insurance provided under this Coverage, as set forth in this section 'Accident Loss Benefits,' does not cover any loss which results . . . . (b) directly or indirectly from bodily or mental infirmity or disease or medical or surgical treatment thereof, . . ."

Defendant's instruction No. 8. "An insurance company may limit its contractual liability by any appropriate provision not prohibited by public policy or statute. It is further entitled to select and classify its risks according to its own standards."

The jury had the policy before it as an exhibit, and could refer to it if necessary. However, the interpretation of the policy was entirely a matter for the court, and the jury was required to follow the court's interpretation. (See *Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) The portion of the policy which the court read to the jury was interpreted by the court in an instruction using other language, in accordance with the *Brooks* rule. The policy language, by itself, invited misinterpretation by laymen not versed in the legal distinctions between proximate and contributing causation, as

applied in the "chain of events" principle established in the *Brooks* line of cases. Reading this policy language to the jury, as an instruction of the applicable law, created an apparent contradition with the instructions relating to causation and burden of proof, which were given in different language.

Defendant's instruction number 8, that an insurance company may limit its contractual liability, is at best an intrusion of a false issue, and at worst, a suggestion that the decedent was unworthy of coverage. That implication was particularly unfortunate after the trial court had erroneously (as we point out below) received evidence that other companies had refused to insure Mr. Nash. The fact that the instruction happens to contain a correct statement of law in the abstract is no justification whatever. There was no issue as to the legality of the policy as written. The issue was the applicability of that policy to the death of the policyholder.

The instant matter was resolved by a nine to three jury verdict, and we cannot say that the jury may not have felt obliged, as the result of these unnecessary instructions, to find that disease was the proximate cause of Mr. Nash's death. Thus, we must reverse.

We note plaintiff's contention concerning an evidentiary matter for the trial court's consideration upon retrial. ■ Plaintiff argues that prejudicial error was committed by the admission of evidence (elicited from her on cross-examination) that Mr. Nash had twice been denied life insurance coverage. The trial court admitted the evidence on the theory that it was relevant to a material issue, i.e., the physical condition of the insured.

The testimony was both irrelevant and incompetent. It was irrelevant because we know nothing about the standards used by the companies which had declined coverage on Mr. Nash's life; it was incompetent because, at most, the testimony was a hearsay report of what some employee of some insurance company concluded about Mr. Nash.

On retrial such evidence should not be admitted.

Judgment is reversed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied June 19, 1974, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied July 25, 1974.